Stanley C. WIELGOS, individually and as Trustee for the Stanley C. Wielgos Trust dated April 27, 1983, Plaintiff,

v.

COMMONWEALTH EDISON CO., et al., Defendants.

No. 84 C 1222.

United States District Court, N.D. Illinois, E.D.

April 20, 1988.

A. Denison Weaver, A. Denison Weaver, Ltd., Chicago, Ill., for plaintiff.

Gary M. Elden, Thomas J. Krueger, Isham, Lincoln & Beale, Chicago, Ill., and Mark Sableman, Thompson & Mitchell, St. Louis, Mo., for Commonwealth Edison Co.

W. Donald McSweeney, Mitchell S. Rieger, Allen Horwich, Frederick Sperling, Schiff, Hardin & Waite, Chicago, Ill., for Underwriter defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Stanley Wielgos ("Wielgos")—acting on behalf of a class of similarly situated persons (collectively "Plaintiffs")[1]—has sued Commonwealth Edison Company ("Edison") and several underwriters ("Underwriter Defendants")[2] for violations of Securities Act of 1933 § 11, 15 U.S.C. § 77k ("Section 11"). After a good deal of earlier procedural skirmishing, several summary judgment motions have been filed under Rule 56:

1. one by all defendants attacking Plaintiffs' claims;

2. another by Edison on its counterclaim, advanced under Rule 11 and 28 U.S.C. § 1927 ("Section 1927"), for Plaintiffs' having included Count II in their now-superseded Second Amended Complaint;[3] and

3. one by Plaintiffs seeking a judgment as to liability on their Section 11 claims.

Also pending are (4) Plaintiffs' motion for Rule 11 sanctions based on assertedly groundless claims in defendants' memoranda supporting their summary judgment motion and (5) defendants' petition under Rule 37 for attorney's fees incurred to collect on an earlier award of sanctions against Plaintiffs. For the reasons stated in this memorandum opinion and order:

1. Defendants' motion for summary judgment on the Third Amended Complaint is granted, while Plaintiffs' is thus of course denied.

2. Edison's counterclaim is dismissed, without prejudice to its reasserting the same claim as a motion for sanctions under Rule 11 or Section 1927 or both.

3. Defendants' Rule 37 motion is granted in its entirety.

4. Plaintiffs' Rule 11 motion is denied in its entirety.

### Background

On September 22, 1983 Edison registered 3 million shares of its common stock with the Securities and Exchange Commission ("SEC") in a "shelf registration."[4] On December 5, 1983 Edison filed a Prospectus Supplement and offered the 3 million shares to the public at an initial price of $27.625 per share. Plaintiffs bought the shares (Wielgos purchased 500 of them).

On January 13, 1984 the Atomic Safety and Licensing Board (the "Licensing Board"), an arm of the Nuclear Regulatory Commission ("NRC" or "Commission"), denied Edison an operating license for its nuclear-powered generating plant at Byron, Illinois ("Byron 1").[5] On the next market

**1.** On October 9, 1984 this Court's former colleague Honorable Thomas McMillen certified this plaintiff class:

> Those persons who suffered loss or damage by reason of having purchased the common stock of [Edison] as a result of the public offering made through [Edison's] Prospectus and Prospectus Supplement dated September 22, 1983 and December 5, 1983.

In the 3½ years since then the complaint has been twice amended without any explicit reaffirmation that a class action is the appropriate means to proceed. Nevertheless the parties have continued to treat with the action as presenting class claims. To avoid any potential confusion in that respect, this Court specifically finds the claims advanced in the Third Amended Complaint (the "Complaint") have been asserted, and are being treated as having been maintained, as a class action under Fed.R.Civ.P. ("Rule") 23(b)(3).

**2.** Underwriter Defendants comprise Merrill Lynch Capital Markets, First Boston Corporation, Prudential–Bache Securities, Inc. and Dean Witter Reynolds, Inc.

**3.** See the later text discussion headed "Background."

**4.** 17 C.F.R. § 230.415 ("1933 Act Rule 415") allows a corporation to register securities on one date and issue those securities publicly at a later date. All references to other sections in 17 C.F.R. Part 230 will also take the form "1933 Act Rule—," again using only the numbers following the decimal point.

**5.** Edison urges the Licensing Board has no power to deny a permit—"merely" the power to recommend denial to Commission. Because

day Edison's common stock dropped to $21.50, an economic loss to the marketplace of about $1 billion, of which Plaintiffs suffered about $18 million.

Wielgos filed his original complaint in this action on February 8, 1984, while Edison's common stock was still depressed. That original complaint alleged liability only for violations of Section 11.

On December 24, 1984 (after Plaintiffs' class was certified) Wielgos filed a Second Amended Complaint,[6] alleging for the first time a claim sounding in fraud: Edison's alleged violation of Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b) ("Section 10(b)"). Plaintiffs' assertion of the fraud count in the Second Amended Complaint forms the basis for Edison's counterclaim[7] under Rule 11 and Section 1927.

Defendants and Plaintiffs cross-moved for summary judgment on the Second Amended Complaint and counterclaim. On November 10, 1986 Honorable George Leighton (to whom the action was by then assigned) denied Plaintiffs' motion and re-quested oral argument on defendants' motion.

Before oral argument could be held, Plaintiffs moved to file a Third Amended Complaint (the "Complaint") that (1) changed the allegations in the Section 11 count and (2) completely abandoned the Section 10(b) fraud claim. Over defendants' strenuous objections, Judge Leighton granted leave to file the new Complaint on February 25, 1987. That precipitated the current round of motions and briefs.

### Defendants' Summary Judgment Motion

#### 1. Plaintiffs' Allegations

Plaintiffs' Complaint[8] alleges Edison's Registration Statement was "false and misleading, contained untrue statements of material facts and/or omitted to state other facts necessary to make the statements made not misleading" (¶ 9) in two ways:

1. It repeatedly set forth false and misleading projected completion dates and construction costs for Edison's nuclear construction program (the "Projection theory") (¶¶ 10, 12).[9]

---

what the Licensing Board did was to "withhold authorization for an operating license" (and hence it said "The application is, therefore, denied"), and because any possible dispute about the proper locution is really irrelevant to this Court's analysis, this opinion will use Plaintiffs' "denial" characterization. As the final substantive section in the text ("Plaintiffs' Rule 11 Motion") reflects, the difference in terminology used by the parties is of no real import anyway.

**6.** Changes made by the intermediate First Amended Complaint are immaterial to the pending motions.

**7.** Filing a request for sanctions as a counterclaim is certainly unusual, but that *is* the way this case comes to this Court. More on this in the text section labeled "Edison's Counterclaim."

**8.** All Complaint citations will take the form "¶ —."

**9.** ¶ 10 reads:

The Registration Statement, with repetition, and in particular Commonwealth's 10–K for the year ending 1982 and Commonwealth's 10–Q's for the periods ending March 31, 1983, June 30, 1983 and September 30, 1983, sets forth the completion dates and estimated construction costs of Commonwealth's various nuclear power plants in the course of con-struction, including Commonwealth's Byron Unit No. 1, affirmatively stating that the schedule of dates and costs disclosed has taken into account delays resulting from difficulties in meeting design and construction schedules, as well as NRC regulatory delays. In further reference to said delays, Commonwealth stated:

"The Company does not believe, so far as it now foresees, that such violations or defaults will have a material adverse effect on its future business and operating results ..."

Said statements were false and misleading and, by omitting material facts, conveyed to the investor the impression that any construction problems, including delays and/or additional costs, had already been accounted for; that any regulatory problems were of a routine nature and would not have an adverse effect on Commonwealth's operating and financial projections.

¶ 12 reads:

That separate and apart from Commonwealth's omission to disclose the pendency of the Byron licensing proceedings, as required under 17 C.F.R. § 229.103, Commonwealth underestimated in its Registration Statement the expected completion dates of its various nuclear plants under construction, as well as understating the estimated total costs of construction of said units.

2. It failed to disclose information about the pending licensing for the Byron plant (the "Legal Proceeding theory") (¶ 11).[10]

Both sides have treated the Projection theory and Legal Proceeding theory as independent bases for liability, each of which must be addressed.

## 2. Liability Under Section 11

■ Section 11 creates a cause of action for purchasers of a security when "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." Both the issuer and any underwriter of the security are appropriate defendants in a Section 11 action.[11] As *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 868–87, 74 L.Ed.2d 548 (1983) (footnotes omitted) noted:

> The section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard

of liability on the parties who play a direct role in a registered offering. If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements.

Unlike someone suing under Section 10(b), then, a Section 11 plaintiff need not establish scienter, the "intent to deceive, manipulate, or defraud" (*id.* at 382, 103 S.Ct. at 687).

■ Damages under Section 11 are established by the formulas in Section 11(e). While there are exceptions (and those exceptions undoubtedly apply to some class members), most Plaintiffs' damages are set at the difference between the price at which the securities were offered and the price on the day suit was filed, even if any such Plaintiff retained his or her stock and its price recovered.[12]

---

10. ¶ 11 reads:

That notwithstanding that the rules and regulations of the SEC, and in particular, 17 C.F.R. § 229.103, expressly required that Commonwealth disclose in the Registration Statement all material pending legal proceedings, Commonwealth failed to disclose the pendency of the Byron licensing proceedings; including a failure to disclose the agency in which the proceedings were pending, the date instituted, the principal parties thereto, and the factual basis underlying the proceedings or the relief sought, as mandated by 17 C.F.R. § 229.103; in which Commonwealth was seeking an operating license for its Byron Unit No. 1, which was being resisted by various public action groups. That the issuance of an operating license to Commonwealth by the ASLB was a condition precedent to the loading of nuclear fuel and the placing of said unit in Commonwealth's rate base so as to allow Commonwealth to begin to recover its construction costs, which were in excess of $2 billion and which continued to accrue at the rate of $38 million per month until such time as the plant became operational.

11. Section 11(b)(3) provides an affirmative defense to defendants other than the issuer if they can prove "due diligence." Underwriter Defendants have joined Edison's motion, maintaining there was no violation of Section 11(a), but they have not also asserted a Section 11(b)(3) de-

fense. P.Mem. 33 contends Underwriter Defendants' failure, in supporting their motion for summary judgment, to show they exercised due diligence entitles Plaintiffs to summary judgment against Underwriter Defendants. That is patently incorrect. If Underwriter Defendants show they are entitled to judgment as a matter of law because Section 11 was not violated, they do not need any affirmative defenses. Their victory on the position they *have* asserted obviates any possible problem that would have been posed if Underwriter Defendants had lost on this motion and if they were later to seek to proffer the Section 11(b)(3) defense at trial or on a second motion for summary judgment (see generally Appendix to *Teamsters Local 282 Pension Trust Fund v. Angelos,* 649 F.Supp. 1242, 1252–53 (N.D.Ill.1986)).

12. Defendants stress that Edison's stock has rebounded and (by their characterization) done quite well. Plaintiffs correctly say that has no effect on the measure of damages. Yet the subsequent performance of Edison's stock *is* relevant to whether the alleged misstatements were material. Other factors being equal, information that causes a permanent shift in price (or at least one that persists until after that information has been corrected in the marketplace) is more likely to have been material than information that causes only a temporary swing in price.

## A. Projection Theory

### (1) Facts [13]

Edison's September 22 Registration Statement, when combined with other SEC filings incorporated into it by reference,[14] includes 176 printed pages of disclosures to investors. Those disclosures included the following:

1. Edison's anticipated schedule for completion of the Byron and Braidwood stations: [15]

| Station | Service Date |
| --- | --- |
| Byron 1 | 1984 |
| Byron 2 | 1985 |
| Braidwood 1 | 1985 |
| Braidwood 2 | 1986 |

2. Total estimated costs: [16]

| Station | $(1000's) |
| --- | --- |
| Byron 1 and 2 | 3,344,700 |
| Braidwood 1 and 2 | 3,100,800 |

Each time a projection appeared in an incorporated filing it was prefaced by cautionary language about future changes. Thus the 1982 10–K report (D.Ex. B–1 at 4) said, in language repeated verbatim in each later filing that disclosed projections:

> [T]he Company has under construction the additional generating units set forth below, the completion and operation of which will be subject to various regulatory approvals. These approvals may be subject to delay because of the opposition of parties who have intervened or may intervene in proceedings with respect thereto, changes in regulatory requirements or changes in design and construction of these units.

Moreover, each projection was followed by an acknowledgement that delays and cost increases had already been incurred and might be repeated. Again the 1982 10–K is typical (id. at 5): [17]

> The scheduled service dates and estimated costs set forth in the above table reflect delays in service dates as a result of difficulties in meeting design and con-

---

**13.** Familiar Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). Such a motion may be supported by the movant's proffer of evidence of the sort that would be admissible at trial (Rule 56(e)) or, when the nonmovant would have the burden of proof at trial, by the movant's pointing to the absence of evidence sufficient to raise an inference in the nonmovant's favor (Celotex, id. at 324, 106 S.Ct. at 2553). For that purpose this Court draws all "reasonable inferences, not every conceivable inference," in the light most favorable to the nonmovant—for present purposes Plaintiffs (DeValk Lincoln Mercury, Inc. v. Ford Motor Co., 811 F.2d 326, 329 (7th Cir. 1987)). This opinion follows that principle, citing to the parties' respective submissions this way:

  1. Defendants' Memorandum in Support of Their Motion for Summary Judgment: "D.Mem. —";
  2. Defendants' Statement of Material Facts Not in Dispute: "D.Facts ¶ —";
  3. Plaintiff's Memorandum in Support of Plaintiff's Cross-motion for Summary Judgment on the Issue of Liability and in Opposition to Defendants' Motion for Summary Judgment: "P.Mem. —";
  4. Plaintiff's Statement of Material Facts Not in Dispute Pursuant to Local Rule 12(e): "P.Facts ¶ —";
  5. Plaintiff's Response Under Local Rule 12(f) to item 4: "P.Issues ¶ —";
  6. Defendants' Statement of Genuine Issues: "D.Issues ¶ —";
  7. Defendants' Reply Memorandum Supporting Their 1987 Motion for Summary Judgment and Opposing Plaintiff's Motion for Summary Judgment: "D.R.Mem. —";
  8. Plaintiff's Reply Brief in Support of Plaintiff's Motion for Partial Summary Judgment on the Issue of Liability: "P.R.Mem. —."

Exhibits will be identified by referring to the party offering them, followed by a citation to the page or numbered paragraph (exhibits tendered with D.R.Mem. will carry that added reference to avoid confusion).

**14.** SEC rules allow registration statements to incorporate other filings by reference, even if the incorporated documents postdate the registration. As discussed later in the text, after-incorporated documents create some difficulties here.

**15.** Such projections appear in Edison's 1982 Form 10–K (D. Ex. B–1 at 4–5), its June 30, 1983 10–Q (D.Ex. B–3 at 27–28) and its September 30, 1983 10–Q (D.Ex. B–4 at 29–30).

**16.** See n. 15.

**17.** This language too was repeated verbatim each time projections were disclosed.

struction schedules. They also reflect Nuclear Regulatory Commission ("NRC") regulatory delays and the need to spread financing requirements more evenly throughout the construction period in order to keep annual financing requirements within the Company's financial capabilities. These delays have significantly increased the estimated construction costs of the units. Further delays in licensing or difficulties in construction could further affect the scheduled service dates and ultimate costs of the generating units under construction. Edison's September 9, 1983 Form 8–K (which was incorporated into the Registration Statement) disclosed Edison was reviewing its construction projections (D.Ex. B–7):

> The Company is in the process of conducting its annual review of the status of its construction program. While that review has not been completed, it appears likely that at the conclusion of the review the Company will announce a delay of approximately three months in the service date and a resultant cost increase for its Byron Unit 1. Any change in the service dates of the remaining generating units under construction will not be ascertained until the completion of the review.

Edison then added that same disclosure to its September 30, 1983 10–Q, where it discussed the construction projection (D.Ex. B–4 at 29).

Edison had indeed begun its annual construction cost review in early September (Peterson Aff. ¶ 2; D.Ex. I ¶ 2). That process continued through late December, when the Manager of Projects submitted his recommended revisions to the Expenditure Control Committee (*id.* ¶¶ 3, 4), which Committee in turn approved a projection on January 10, 1984 (*id.* ¶ 4). That projection would have increased the total cost of the two Byron units by $220 million, or 6.6% (*id.* ¶¶ 4, 5).[18] Because the Licensing Board denied the Byron 1 operating permit

January 13, Edison increased the projected cost another $93 million before it first disclosed the new projection in its January 17 8–K statement (D.Ex. J at 3).

■ Section 11 penalizes both (1) untrue statements of material facts and (2) omissions of material facts either (a) required to be included or (b) needed to prevent other disclosures from being misleading. Plaintiffs say both that the projected service dates and costs were untrue and that Edison's failures to update the projections constituted omissions of material facts needed to prevent the projections from being misleading. Defendants offer four arguments, each of which they say merits judgment on their behalf:

1. All statements were accurate.

2. Non-final changes in projections need not be disclosed.

3. Edison's cost increases and delayed completion were not material.

4. Incorrect projections, without more, do not trigger liability under Section 11.

While the last of those arguments turns out to be dispositive on this motion, each will be dealt with.

**(2) Liability for Projections—Failure To State a Claim**

■ Complaint ¶ 12 (set out in n. 9) says Edison underestimated the completion dates of its nuclear units and understated the total costs of those units in the Registration Statement. Given the facts just outlined, the truth of that allegation cannot be gainsaid. Nevertheless, as D.Mem. 19–20 points out, nothing in the Complaint says Edison knew the projections would turn out to be wrong, acted in bad faith or even prepared the projections negligently.[19] Rather the Complaint seeks to impose liability solely on the basis that the crystal ball turned out to be clouded.

That approach is foreclosed by 1933 Act Rule 175 (not cited by Edison), which im-

---

18. At the same time the projected total cost of the Braidwood units was increased $475 million or 15.3%.

19. Plaintiffs did make such allegations in the Second Amended Complaint, but they have withdrawn them from the current Complaint.

munizes such projections unless the projections are disclosed without a reasonable basis or other than in good faith:

(a) A statement within the coverage of paragraph (b) of this section which is made by ... an issuer ... shall be deemed not to be a fraudulent statement (as defined in paragraph (d) of this section), unless it is shown that such statement was made or reaffirmed without a reasonable basis or was disclosed other than in good faith.

(b) This rule applies to the following statements:

(1) a forward-looking statement (as defined in paragraph (c) of this section) made in a document filed with the Commission, ....[20]

(c) For the purpose of this rule, the term "forward-looking statement" shall mean and shall be limited to:

(1) A statement containing a projection of revenues, income (loss), earnings (loss) per share, capital expenditures, dividends, capital structure or other financial items;

(2) A statement of management's plans and objectives for future operations; ... or

(4) Disclosed statements of the assumptions underlying or relating to any of the statements described in paragraphs (c)(1), (2), or (3) of this section.

(d) For the purpose of this rule the term "fraudulent statement" shall mean a statement which is an untrue statement of material fact, a statement false or misleading with respect to any material fact, an omission to state a material fact necessary to make a statement not misleading,[21] ... as those terms are used in the Securities Act of 1933....

Both projections at issue here are "forward-looking statements" as defined in the rule. Edison's cost estimate is a "projection of ... capital expenditures," while the projection of in-service dates is a "statement of management's plans or objectives for future operations."[22] Every objected-to statement was made in a document filed with the Commission (both directly and by incorporation into the Registration Statement). Accordingly the statements cannot be deemed fraudulent under Section 11 unless not made in good faith or made without a reasonable basis.

In its present reincarnation the Complaint therefore does not state a claim based on inaccurate projections of the cost or in-service dates of Edison's nuclear plants. Nonetheless Plaintiffs' memoranda —with a fine disregard for their own recast pleading—sometimes argue Edison did not act in good faith or that its projections were unreasonable. Were this opinion to limit itself to a ruling on Plaintiffs' claim as tendered, they might feel no compunctions about seeking to prolong the agony by returning with a Fourth Amended Complaint.[23] This opinion therefore goes on to decide whether summary judgment is appropriate on the other grounds raised by Edison.

(3) Accuracy of Statements

▮ Edison first contends all statements in its Registration Statement were accurate as of the effective date of the Registration

---

**20.** [Footnote by this Court] Subparagraph (b)(1) contains two provisos not relevant here.

**21.** [Footnote by this Court] It may be noted the list of phrases considered the equivalent of "fraudulent statement" in the rule does not include "omitted to state a material fact required to be stated," one of Section 11's prohibitions. That difference is irrelevant here: Plaintiffs have not argued there was any omission of a required fact on that score.

**22.** Indeed, the various statements might also qualify under paragraph (c)(4) as assumptions underlying financial projections in the Registration Statement.

**23.** Of course Plaintiffs might not be able to make such allegations in good faith, but that would give little comfort to Edison (which claims Rule 11's requirements have not deterred Plaintiffs to date; see the text section titled "Edison's Counterclaim"). Moreover, while this Court might consider denying Plaintiffs leave to amend yet again, that would likely trigger a new dispute as to whether such denial was an abuse of discretion. There seems little or no reason to go through the motions (in both senses of the word) if Edison would be entitled to summary judgment on the new allegations in any event.

Statement (September 22, 1983), which it labels the only date that counts for Section 11 liability. There is nothing novel about focusing on such effective-date accuracy, but Edison goes farther, saying accuracy as of that date is all that is needed even for documents that were generated *after* that date! Edison bases its argument on a detailed and convoluted interpretation of 1933 Act Rule 415(a), Item 17 of its Registration Statement (D.Ex. A at 5–3 to 5–4) and other provisions.

Though this Court does not of course disparage the need for detailed textual analysis of statutes and regulations, the result reached still has to make *some* sense. D.R.Mem. 13 freely concedes Edison's position "might seem anomalous" to a layman, but it is far more suspect than that. Under Edison's reading a company could shelf-register securities and incorporate by reference a not-then-existing document. Then if circumstances changed it could later file an incorporated document containing an accurate description of the facts existing as of the initial registration date but utterly false as to conditions existing when the new document was filed—all without exposure to Section 11 liability.[24] That surely cannot have been Congress' intent.

Edison's error appears to be its underlying assumption that everything in a registration statement must have the same effective date. But Section 11 itself expressly imposes liability on statements in *part* of a registration statement if they are misleading "when such part became effective." That language necessarily presumes that different parts of registration statements can have different effective dates. And while it makes sense to treat the incorporation of an already-existing document into a registration statement as a reaffirmation of its accuracy (and thus as still effective on the effective date of the registration statement), it would make no sense at all to treat after-incorporated filings as relating back to the same earlier effective date.

After all, the reason for incorporating the later disclosure into the registration statement is to apprise potential investors of changed circumstances. It would be absurd, then, to test the accuracy of the new disclosures by the old circumstances rather than by the changed circumstances the new disclosure was intended to reveal!

All this is obvious, and Edison should really never have made the argument. Indeed, in 1981 the SEC considered a rule that would have said the effective date of after-incorporated filings was the date they were initially filed with the SEC. While the SEC ultimately rejected the contemplated rule, its reasons for doing so confirm this opinion's analysis (Treatment of Information Incorporated by Reference into Registration Statements, 46 Fed.Reg. 42,015, at 42,022–23 (proposed Aug. 18, 1981) (emphasis added and footnotes omitted)):

> The Commission, however, is reconsidering proposed Rule 412 which would provide that the effective date of an incorporated *document for purposes of Section 11(a) is the date of its initial filing with* the Commission. This Rule is clearly appropriate for documents filed and incorporated after the effective date of the Registration Statement. Information in such documents cannot be evaluated, for purposes of Section 11(a), as of a time earlier than their initial filing. *Yet, this conclusion is so obvious that perhaps it need not be stated by rule.*

Documents filed and incorporated after September 22 are therefore not to be judged as if they had been disclosed on that earlier date.

On the other side of the coin, Plaintiffs say all disclosures must be evaluated as of the date Edison issued the stock (December 5, 1983). They offer no case law to support that view, which flies in the face of the plain language of Section 11. Accuracy is assessed as of the effective date of the allegedly misleading part of the Registra-

---

**24.** In fairness to Edison, it does say Section 10(b) and other provisions would be available to protect investors. But Section 10(b) requires proof of scienter and reliance, while Section 11 does not. Edison offers no principled reason why Section 11 should not apply to misleading statements in after-incorporated filings.

tion Statement. For most disclosures that date was September 22, but for after-incorporated documents it was the date they were filed.

Because Edison's latest pre-sale disclosure (the November 9 8–K statement) modified the earlier disclosures as to the cost and scheduling of the nuclear construction program, the disclosures in that document control (see 1933 Act Rule 412). Edison's 8–K said several things in those respects: It had begun its review of the nuclear construction program, the projected in-service date of Byron 1 would "likely" be moved back three months and other changes might occur.

■ Plaintiffs have offered nothing even suggesting either that those statements were false or misleading as descriptions of the status of Edison's review of its construction program or that there was no reasonable basis for Edison's prognosis when made. At most Plaintiffs have (1) asserted Edison failed to disclose that its earlier projections had already proved wrong and (2) mustered evidence of Edison's Manager of Products having prepared a budget revision showing delays and cost increases on November 18. That first contention is not supported by the facts, while the second is not enough to meet Plaintiffs' burden on this motion.

From 1979 through 1982 Edison included projections of construction costs and in-service dates for Byron and Braidwood in its annual 10–K reports. Each year the projected cost increased and the in-service dates were put off (see D.Exs. F, G, H and B–1). Moreover, each 10–K explicitly noted the significant delays and increased construction costs (see, e.g., this opinion's text following n. 17). Far from any cover-up of the cost increases and delays, the record shows Edison repeatedly disclosed earlier errors in its projections.

As for the November 19 memorandum showing further delays and cost increases, Edison has shown that was prepared as part of its annual budget review (see generally D.Exs. I and K). Its projections represented the preliminary requests of mid-level managers and were likely to undergo revision at higher levels of the review process (id.). Plaintiffs have not challenged those showings. On that undisputed factual background, the November 18 memorandum represents the type of tentative internal projection that need not be disclosed (see generally *Panter v. Marshall Field & Co.*, 646 F.2d 271, 292 (7th Cir.1981)).

■ Each part of Edison's registration statement was thus accurate when that part became effective. Hence there can be no Section 11 liability.

### (4) Materiality

Edison also says it is entitled to summary judgment because, even had its Registration Statement contained factual errors, Plaintiffs cannot show those errors were material. In securities-law terms, a fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" (*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (footnote omitted)).[25] Of course the burden of showing materiality of an omitted fact is on Plaintiffs.

Edison says Plaintiffs are unable to show materiality because (1) the 10% cost increase announced in January had no effect on Edison's stock price and (2) the "total mix" of information available to investors included information in the public domain suggesting nuclear construction costs were rising. If Plaintiffs are given the benefit of all reasonable inferences to which they are entitled, neither of those contentions would merit judgment for Edison as a matter of law.

25. *TSC Industries* formulated the standard for materiality under 17 C.F.R. § 240.14a–9. Just last month the Court expressly adopted the same standard for Section 10(b) cases (*Basic Inc. v. Levinson,* —— U.S. ——, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988)), and the SEC has adopted the same formulation in the registration statement context (1933 Act Rule 405). There is no question that materiality standard applies here.

■ While it is true Edison's January 1983 revised projections had no apparent effect on stock prices, that announcement came very shortly after the Licensing Board decision and the substantial drop in Edison's prices that followed. One reasonable inference is that the stock had already adjusted in anticipation of higher costs caused by the Licensing Board decision. If that were so, the changed construction costs and schedule might still have been of independent significance to reasonable investors even though its effect on the market was masked by the related development. In short, though there is force to Edison's market-effect contention, the fact of disclosure (and its effect) cannot be sufficiently isolated to compel a pro-Edison ruling as a matter of law.

Similarly, while there was information in the public domain suggesting nuclear construction costs were rising dramatically, that information may not have been useful to an investor assessing Edison's projections. It might reasonably have been believed Edison had already factored all or part of such increases into its projections.[26] If a reasonable investor might have made such an assumption, the projections Edison did provide could have been misleading as to a material fact.

It thus cannot be said any purported misstatements in the Registration Statement were nonmaterial as a matter of law. But as this opinion has already ruled, (1) there were no misstatements and (2) errors in projections are actionable only if not disclosed in good faith or if made without a reasonable basis. Consequently Edison is entitled to judgment as a matter of law on the Projection theory of Plaintiffs' complaint.

### B. Legal Proceeding Theory

#### (1) Facts

Edison's Registration Statement and incorporated documents repeatedly disclosed the general regulatory background of Edison's nuclear construction program. For example, the 1982 10-K (quoted in the text following n. 17) specifically said completion of the units was subject to "various regulatory approvals" that might be delayed. Edison's 10-K also noted the NRC's jurisdiction over construction and operation of Edison's nuclear plants (Ex. B-1 at 7):

> The Company is subject to the jurisdiction of the NRC with respect to its nuclear power stations. NRC regulations control the grant of permits and licenses for the construction and operation of nuclear power stations and subject such stations to continuing review and regulation. The NRC review and regulatory process covers environmental as well as radiological aspects of such stations. Attempts are made from time to time by various individuals or citizen groups to prohibit the development or use of nuclear power through initiation of proceedings before the NRC, other agencies or courts. Such proceedings frequently involve attacks on the validity of NRC rules which, if successful, could provide a basis for challenges to permits and licenses granted by the NRC in the past.

As of the effective date of the Registration Statement the Licensing Board had completed hearings on Edison's request for an operating permit for Byron 1, and a decision was then awaited (P.Facts ¶ 25). There was no specific mention in the Registration Statement of that proceeding or the nature of the issues under consideration by the Licensing Board.

As already described, the announcement of the Licensing Board's denial of the operating permit caused a substantial drop in the value of Edison's stock. Edison appealed to the Atomic Safety and Licensing Appeal Board ("Appeal Board"), which on May 7, 1984 remanded the record and instructed the Licensing Board to reopen hearings to consider the results of Edison's reinspection program (*Commonwealth Edison Co.* (Byron Nuclear Power Station, Units 1 and 2), ALAB-770, 19 N.R.C. 1163 (1984)). On October 16, 1984 the Licensing

---

**26.** For example, an investor might have been led to believe that by some of Edison's disclosures such as the exerpt from its 1982 10-K quoted in the text following n. 17. Of course, there were also other disclosures suggesting further cost increases were likely.

Board recommended that the operating license be granted (*Commonwealth Edison Co.* (Byron Nuclear Power Station, Units 1 and 2), LBP–84–41, 20 N.R.C. 1203 (1984)), and the license was issued shortly thereafter.

(2) Parties' Positions

Plaintiffs' theory is simple. SEC Regulation S–K (17 C.F.R. Part 229) describes information that must be included in a registration statement. Item 103 governs disclosure of legal proceedings (17 C.F.R. § 229.103):

> Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant ... is a party.... Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought.

Plaintiffs say the Licensing Board hearings were a legal proceeding within the meaning of Item 103, so Edison's failure to disclose those hearings violates Section 11 as a matter of law.[27]

Edison responds in two ways:

1. Essentially the Licensing Board proceeding is merely a small part of the NRC's overall regulatory system, which was fully disclosed.

2. Even if viewed as an independent legal proceeding, the Licensing Board proceeding was too insignificant to be material.

Either of those arguments would defeat Plaintiffs. As the following discussion reflects, they are best dealt with in tandem.

(3) Analysis of the Parties' Positions

Plaintiffs seem to believe that as long as the hearing process before the Licensing Board can be characterized as a "legal proceeding" Edison was required to disclose it separately. Plaintiffs therefore spend much of their time showing the adversarial nature of the process and its similarity to a traditional lawsuit. But that of course is not enough. Even if the Licensing Board was conducting a "legal proceeding," Item 103 required Edison to disclose it only if it was "material" and "other than ordinary routine litigation incidental to the business." For its part, Edison seems to believe that as long as it can characterize the Licensing Board as merely a small nonfinal part of a larger regulatory and permitting system, its disclosure of the overall system is necessarily sufficient.

Neither of these views accurately reflects the overall disclosure system and its purposes. Whether viewed as a discrete legal proceeding or as a small part of a greater whole, a Licensing Board hearing *might* take on such importance as to require detailed disclosure.[28] And that in turn would depend on the status and reasonably perceived significance of the proceeding at the time the registration statement made its disclosures.

Thus, after the Licensing Board denied the operating permit Edison disclosed the status of the proceeding in greater detail—acknowledging the denial and discussing the pending appeal (see Edison's January 17, 1984 Form 8–K, D.Ex. J).[29] That disclosure was certainly appropriate—but not because the Licensing Board proceeding had suddenly changed from a part of a larger process to a discrete "legal proceeding." Rather the disclosure reflected Edison's

---

27. D.Mem. 35 argues in passing that liability exists only for violating Section 11 and not for any violation of Item 103. But Section 11 imposes liability for omitting "a material fact required to be stated therein." If Item 103 imposes the claimed requirement and the omission is material, by definition Section 11 is violated.

28. It really doesn't matter whether the required disclosure is seen as providing more details about a regulatory system or as disclosing a discrete legal proceeding.

29. This reference to Edison's post-decision disclosure should not be misunderstood as adopting Plaintiffs' contention that such disclosure somehow shows Edison should have made similar disclosures in its Registration Statement. Denial by the Licensing Board was certainly a substantial (and obvious) change in circumstances.

judgment that the Byron licensing proceeding had taken such a turn as to require particularized—rather than more general—disclosure of its status. What this Court is called upon to decide is whether there is a material factual basis for contending that should have been done before the decision was known or announced.

Before the Licensing Board issued its adverse decision Edison had disclosed the overall existence of the licensing system, as well as its potential for increasing costs, delaying construction timetables and even preventing operation of plants. Without doubt such a disclosure would be sufficient if Edison's projects were moving through that system in a routine fashion and if no more than routine snags were reasonably anticipated. At its core, Plaintiffs' case is that Byron did not fit that description. Instead Plaintiffs say Edison had experienced quality assurance problems that led to extensive hearings—a process that should have put Edison on notice that a license might not be forthcoming in a routine fashion. Under those circumstances, Plaintiffs say Edison should initially have disclosed the status of the Byron licensing proceeding in more detail.

This dispute calls into play the test for materiality as to "contingent or speculative information or events," as just described in *Basic*, 108 S.Ct. at 987, quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir.1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)):

> [M]ateriality "will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in the light of the totality of the company activity."

Edison argues both that the probability of the Licensing Board's denying the Byron 1 operating permit was low and that, despite the effect of the announcement on Edison's stock, the true impact of the decision on Edison was not substantial.

Viewed at the time of the Registration Statement, Licensing Board denial of an operating permit surely looked extremely unlikely. No operating permit had ever been denied in the past. While Edison certainly knew such denial was a possibility (e.g., Shewski Dep., P.Ex. 4 at 37, 118–19), Plaintiffs have offered no evidence leading to any inference that denial of the permit was a sufficiently foreseeable prospect as to demand specific rather than general disclosure. Plaintiffs have shown there were problems with the quality assurance system at Byron that had led to a reinspection program still underway at the time of the Registration Statement (P.Facts ¶¶ 24, 25). Because Edison "knew" an operating license would not be issued until the reinspection program was satisfactorily completed, Plaintiffs apparently contend denial of the license was a reasonable possibility.

Yet there is a critical difference between failure to approve an operating license until certain evidence is available (which was reasonably foreseeable) and denial of the license (which Edison says it could not have foreseen).[30] Though hindsight should not dominate decisions as to proper disclosure (which is properly a function of what is known at the time of filing, not later), it is highly significant that the Appeal Board reversed the Licensing Board's *denial* of the license, even though the Appeal Board supported the Licensing Board's determination there was insufficient evidence to support granting a license. As the Appeal Board held (19 N.R.C. 1163, 1169 (quoting the Licensing Board, 19 N.R.C. at 218)):

> We think that the [Licensing] Board should have adopted the alternative of

---

**30.** Indeed, the Licensing Board itself referred to the "traditional practice of reserving jurisdiction" over license proceedings when Boards were dissatisfied with safety evidence (19 N.R.C. at 279). However, it decided to deny the license to allow Edison to appeal its determination (*id.*):

> To reserve jurisdiction and to postpone final decision, in the face of the pending comple-

tion of construction at Byron, would impose unilaterally on the parties, particularly [Edison], our own view of the facts, law and appropriate remedy. Unless [Edison] could mount a difficult interlocutory appeal from such a determination (to postpone our decision), it would have been denied due process.

"informing the parties now of the substance of [its] views on the quality assurance issues, retaining jurisdiction over them, and providing for further proceedings before [it]."

Clearly the probability that the Licensing Board would deny the operating license was very low at the time of the Registration Statement—denial was both erroneous and unprecedented.

As for the other factor in the balancing suggested by *Basic*—the potential impact of the uncertain event—there is no question that the *potential* impact of the Licensing Board's decision, if upheld, was severe. *Permanent* denial of an operating license for Byron would have had a devastating effect on Edison, rendering useless an investment reaching into billions of dollars. But of course that is only the most severe possible outcome, and the probability that a license would never issue approached zero. Somewhat more probable (though—as already explained—still unlikely as of the date of the Registration Statement) would be an outcome such as what did occur here. Edison says the actual impact of the Licensing Board decision approached zero because the issuance of a license would have been delayed anyway by the reinspection program and hearings on its results. Yet even if this Court credits Plaintiffs' contention that the decision cost Edison $200 million,[31] that impact—however large in most circumstances[32]—is not devastating to a $30 billion utility. Plaintiffs also point to the effect of the decision on Edison's stock as a second indication of the impact on Edison. Yet that effect was transitory and certainly appears more the result of the way the decision was publicized than of investors reacting to the true likely impact on Edison's bottom line.

To be sure, the balancing of probability and magnitude of an uncertain event is fact-specific and is judged by what a "reasonable investor" would have considered important to the "total mix" of information. Thus summary judgment would seem an out-of-the-ordinary outcome. Yet *Basic* itself noted summary judgment may sometimes be granted and remanded the case with a specific directive to consider the appropriateness of such a disposition (108 S.Ct. at 988).

■ This case is the paradigm for summary disposition. While at the time of the Registration Statement the magnitude of the uncertain event—denial of the operating license—may have been large enough to assume materiality had that event been probable, the likelihood of the event was extremely low. As already said, the Licensing Board's denial of the license was not reasonably foreseeable, was unanticipated and was found erroneous on appeal. Under the circumstances a chapter-and-verse description of the status and potential outcomes of the specific Licensing Board hearings at the time of the Registration Statement, rather than the more generalized (and really accurate) summary disclosure contained in that Statement, could not have assumed actual importance in the deliberations of a reasonable investor. Edison is entitled to a judgment as a matter of law on the Legal Proceedings theory as well.

### *Edison's Counterclaim*

■ Edison also moves for summary judgment on its counterclaim against Wielgos seeking sanctions under Rule 11 and Section 1927. Edison says Wielgos' fraud

---

**31.** That figure comes from Edison's contemporaneous statements to the Appeal Board (P.Ex. 2). In turn those statements were apparently based on Edison's effort at the time to reverse the Licensing Board decision and obtain a permit to begin fuel loading immediately. Edison's current claim of zero impact is based on its apparent willingness to accept (at least for purposes of this litigation, where doing so helps it) the ultimate determination that a license should have been deferred.

**32.** Though this Court has not tracked down the precise quotation, one of the late Senator Dirksen's famous one-liners (referring to some federal governmental activity) went something like this:

A million here and a million there, and pretty soon you're starting to talk about real money.

With due regard for the galloping inflation in federal budgets, a modern-day Senator Dirksen would have to supplant "million" with "billion" in both places.

allegations in the Second Amended Complaint (1) were not based on a reasonable belief, formed after reasonable investigation, that they were well grounded in fact or law and (2) were intended to extend this case vexatiously and unreasonably.[33] Edison bases those claims primarily on Wielgos' counsel's asserted failure to review materials Edison had made available before he brought the fraud allegations.

Edison cannot surmount a threshold hurdle: Its contentions are inappropriate for a counterclaim. Instead they should be brought as motions for sanctions in the underlying action. Edison offers no support for the notion that either Rule 11 or Section 1927 creates an independent cause of action on behalf of the purported victim of the Rule- or statute-violative conduct.[34]

Accordingly the counterclaim is dismissed. Edison is of course free to reassert its claim as a motion for sanctions. Should it choose to do so, counsel for Wielgos should be prepared to respond, describing in detail his pre-filing investigation of the fraud allegations.

### Defendants' Rule 37 Petition

Defendants have also petitioned for reimbursement of attorney's fees they incurred to obtain compliance with Judge Leighton's order affirming sanctions against Wielgos for violating discovery orders. Their petition is brought under Rule 37(b)(2) and this District Court's Civil Rule 18.

On July 10, 1986 Magistrate Weisberg awarded Defendants attorney's fees under Rule 37(a)(4) because Plaintiffs had unreasonably failed to answer interrogatories, even after being ordered to do so. On October 31, 1986 Judge Leighton affirmed the award.

Wielgos initially appealed, but he then voluntarily dismissed the appeal in December 1986 because the order was not appealable. Each of defendants' counsel wrote Wielgos' attorney immediately thereafter, requesting payment (Plaintiff's Response to Defendants' Motion for Rule To Show Cause, July 20, 1987 Exs. A and B).[35] Counsel for Underwriter Defendants also requested payment orally on February 20, 1987 (Sperling Aff., D.R.Mem. (Rule 37 Petition) Ex., July 24, 1987). When payment was not forthcoming, defendants moved for a rule to show cause why Wielgos should not be held in contempt. Rather than comply even at that late date, Wielgos responded by rearguing issues Judge Leighton had already decided against him. In fact, Wielgos complied with the sanction order only after—on July 31, 1987—Judge Leighton issued a rule to show cause why Wielgos should not be held in contempt.

---

**33.** Either of those things, if established, could ground liability on the part of Wielgos or his lawyer.

**34.** There is of course a related independent cause of action against Wielgos: a state-law claim of malicious prosecution. However, no such claim is tenable here. It is familiar territory that one prerequisite of a malicious prosecution claim is the bona fide termination of the allegedly infringing action in favor of the plaintiff (*Denton v. Allstate Insurance Co.,* 152 Ill. App.3d 578, 583, 105 Ill.Dec. 471, 474, 504 N.E. 2d 756, 759 (1st Dist.1986)). When Edison's counterclaim was brought such a claim was unquestionably premature. Even now a malicious prosecution claim would be problematic, because Edison didn't actually win on the fraud claim—Wielgos merely dropped it.

**35.** In response Wielgos now says in part (Mem. 2):

Defendants failed to demand payment of the fees assessed at any time subsequent to the order of the Court of Appeals entered on January 5, 1987, but instead waited six months and then, rather than make a demand for payment, filed their petition for a rule to show cause.

That assertion distorts the record beyond recognition. First, it appears to be literally false— Plaintiffs ignore defendants' sworn affidavits of oral requests after January 5 and simply assert otherwise in unsworn filings. Second, the Court of Appeals dismissed the appeal on December 18, 1986 (not January 5, 1987), and defendants *did* request payment immediately thereafter. On January 5 the Court of Appeals simply explained its earlier order to Plaintiffs' counsel, who apparently did not understand it. Yet Plaintiffs' Response makes no mention of the December 1986 letters and instead tries to make this Court think defendants did nothing. Such calculated attempts to deceive this Court are not acceptable. This opinion's next section deals with Plaintiffs' groundless charges that defendants engaged in such conduct. People who live in glass houses. . . .

Defendants seek reimbursement for a portion of their expenses in bringing the contempt proceeding.[36] Wielgos' first response is that Magistrate Weisberg denied defendants' request for fees for defending the appeal of the Magistrate's order imposing fees. That is irrelevant. Defendants are not now seeking those expenses, but only a portion of the cost of pursuing Plaintiff *after* the Magistrate was upheld. Wielgos' second response is to assert good faith in responding to the motion and rule to show cause. Of course, that doesn't explain why the motion had to be brought in the first place. Moreover, nothing in either Rule 37 or Civil Rule 18 requires a showing plaintiff did not act in good faith. Finally, Wielgos' silent refusal to comply with a court order and his later claim of reliance on a legal interpretation already rejected by the court, while *perhaps* not contumacious, certainly does not demonstrate good faith in any objective sense.[37]

■ This Court concludes Civil Rule 18 does not warrant an award of attorney's fees in the circumstances presented here. That Rule allows the party seeking a contempt order to include "as an item of damage" a "reasonable counsel fee, necessitate[d] by the contempt proceeding." Here defendants did not seek such an element of damages when they brought the contempt proceedings.

■ Rule 37(b)(2) nevertheless justifies the award sought here. Judge Leighton's October 31, 1986 order, while not appealable, was final and immediately enforceable. Had defendants incurred expenses defending an appeal of the order, Rule 37(b) would allow an award of their fees for doing so (*Tamari v. Bache & Co.*, 729 F.2d 469, 475 (7th Cir.1984)). Their need to institute contempt proceedings is no less appropriate an occasion for sanctions. As this Court said in *Aerwey Laboratories, Inc. v. Arco Polymers, Inc.*, 90 F.R.D. 563,

565–66 (N.D.Ill.1981) (quoted with approval in *Tamari*, 729 F.2d at 475), Rule 37 sanctions "should encompass all expenses, whenever incurred, that would not have been sustained had the opponent conducted itself properly."

Here Judge Leighton found Plaintiffs acted improperly in failing to comply with discovery orders. They must pay the full cost thrust on defendants, whether or not their later behavior was independently improper.

■ Plaintiffs also seek an evidentiary hearing under Rule 37(a)(4) to determine the reasonableness of the total amount defendants seek. Rule 37(a)(4) calls for a "hearing" to determine whether expenses of a motion to compel shall be awarded, and Rule 37(b)(2) should be read the same way (although it does not specifically say so). Plaintiffs got that hearing long ago. There seems no question that the modest amounts requested here are reasonable. This added procedural request by Wielgos looks like another procedural ploy. All the same, if he wants his hearing this Court will provide one—but on two conditions:

1. If the hearing proves more than the requested amount as the reasonably allowable fee, that larger amount will be awarded.

2. If the hearing proves at least the requested amount as the reasonably allowable fee, defendants will also be awarded their fees incurred in the hearing as part of the award.

This Court will await notification from Wielgos' counsel on or before April 29, 1988 (by a filing in chambers) as to whether or not he wishes an evidentiary hearing. Absent an affirmative answer to that question, Wielgos is directed to pay Edison $100 and Underwriter Defendants $1,000 on April 29 as partial compensation for their expenses in the contempt proceeding. To

---

**36.** Edison says its attorneys spent three hours on the memoranda and appearances. Underwriter Defendants (who took the lead) say their attorneys spent 15 hours and a summer associate spent another 15. Edison seeks only $100 and the Underwriter Defendants $1,000 in reimbursement.

**37.** As in the Rule 11 area, there is no room for an "empty head, pure heart" insulation from responsibility here. Subjective good faith—even if shown (a doubtful possibility at best)—would not suffice.

avoid any possible misunderstanding or further delay, such payment is to be made whether or not Wielgos appeals any part of this decision. If our Court of Appeals should reverse on this sanctions issue, Wielgos will get his money back then (*Mulay Plastics, Inc. v. Grand Trunk Western R. Co.*, 742 F.2d 369, 370 (7th Cir.1984)).

### *Plaintiffs' Rule 11 Motion*

Plaintiffs seek sanctions under Rule 11 for two arguments defendants made in seeking summary judgment. Defendants' success on the motion for summary judgment does not itself foreclose sanctions if the submissions supporting the motions were not "well grounded in fact." Plaintiffs' objections focus on two facets of defendants' submissions, neither of which need be discussed at any length.

First, Plaintiffs object to the following passage at D.Mem. 11 (repeated elsewhere as well):

> The Licensing Board, despite its name, had no authority to issue or deny a license but could only make a recommendation to be acted on by the Director of Nuclear Reactor Regulation. *See* 10 C.F.R. § 2.760a.[38]

Plaintiffs cry foul, saying the Licensing Board does make final decisions rather than recommendations. But defendants did no more than characterize the Licensing Board's activities as part of their legal argument. Their position—that the Board is part of a larger licensing system—is not only objectively reasonable but obviously correct. Defendants' statement is far from sanctionable.

 Plaintiffs' second objection is that defendants tried to mislead this Court as to the content of the Registration Statement. Plaintiffs cavil at a paragraph at D.Mem. 10 and D.Facts ¶ 8 describing the disclosures. Portions of the paragraph appear in quotes (and are indeed quotes from the Registration Statement), while other portions of the description are outside quotation marks. Plaintiffs say defendants thereby tried to fool this Court into believing the entire paragraph was a direct

quote! That position is absurd and should never have been made. Plaintiffs' Rule 11 motion is denied in its entirety.

### *Conclusion*

Defendants have shown there is no disputed issue of material fact and they are entitled to a judgment as a matter of law. This action is dismissed. Edison's counterclaim is dismissed without prejudice to its reasserting the matters therein in an appropriate motion for sanctions. Defendants' petition for expenses under Rule 37(b)(2) is granted. Unless a request for an evidentiary hearing on the amount of that award is timely filed, Wielgos is ordered to pay Edison $100 and Underwriter Defendants $1,000 on or before April 29, 1988. Plaintiffs' motion for sanctions is denied.