Mark G. EPSTEIN; Samuel C. Arsers, on behalf of themselves & all others similarly situated, Plaintiffs–Appellants,

v.

WASHINGTON ENERGY CO.; James A. Thorpe, Defendants–Appellees.

Nos. 94–35873.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 19, 1995.

Decided May 14, 1996.

the victims of a "fraud on the market." The district court granted Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. Affirmed.

Steve W. Berman, Hagens & Berman, Seattle, Washington, for plaintiffs-appellants.

Douglas M. Schwab, Heller, Ehrman, White & McAuliffe, San Francisco, California, for defendants-appellees Washington Energy Company and James P. Torgerson.

Evan L. Schwab, Bogle & Gates, Seattle, Washington for defendant-appellee James A. Thorpe.

Before: REINHARDT and TROTT, Circuit Judges, and SCHWARZER, District Judge.*

TROTT, Circuit Judge:

## OVERVIEW

Plaintiffs Mark Epstein and Samuel Arsers, purchasers of Washington Energy Company's common stock, appeal from the district court's order dismissing their securities fraud class action suit. In their Amended Complaint, Plaintiffs allege that Washington Energy Company and two of its senior officers violated §§ 10(b) & 20 of the Securities Exchange Act of 1934 and various state laws by stating the potential benefits of a rate increase for its subsidiary Washington Natural Gas, a regulated public utility, without disclosing: 1) that the Washington State Utilities and Transportation Commission had previously disapproved of Defendants' wrongful allocation of costs and attempts to subsidize unregulated operations, and 2) that the 1992 rate increase request was predicated on the same condemned practices. In the vernacular, Plaintiffs alleged that they were

## I

### FACTS AND PRIOR PROCEEDINGS

Plaintiffs brought this class action suit against Washington Energy Company (WEC) and two of its senior officers, defining the class as all persons who purchased WEC common stock during the period of July 27, 1992 to September 28, 1993 (the Class Period). During the Class Period, Defendants represented that WEC's subsidiary Washington Natural Gas (WNG) had filed for a substantial rate increase from the Washington State Utilities and Transportation Commission (WUTC). The securities market allegedly believed that a rate increase in some material amount was likely and priced WEC stock higher as a result. Ultimately, the WUTC rejected the rate increase and ordered Washington Natural Gas to lower its rates, finding that the rate increase proposal inappropriately sought to recover costs associated with WEC's non-utility subsidiaries. WEC's stock fell from a high of $25-3/8 per share during the Class Period to $17 per share at the close of the Class Period.

### A. Defendants' Statements Regarding the Rate Increase

Plaintiffs assert their fraud on the market theory based on the following statements:

*July 1992 Press Release.* Defendants announced Washington Natural Gas's filing for a general rate increase requesting an additional 13%, or approximately $41 million, in revenues annually.

*Registration Statement.* On September 10, 1992, Defendants filed a Form S-3 Registration Statement with the Securities and Exchange Commission (SEC) representing that Washington Natural Gas had "historically been allowed general rate increases primarily to offset increased operating costs

---

* The Honorable William W Schwarzer, Senior U.S. District Judge, Northern District of California, sitting by designation.

attributable to inflation." The statement noted that the "WUTC has until June 1993 to act on the filing."

*Letter to Shareholders.* On December 4, 1992, Defendants sent a letter to WEC shareholders portraying the rate request filing as "designed to enable us to earn a proposed 10.68 percent rate of return at our utility," and that "if approved it would increase our annual revenues by up to $41 million, or 13%." The letter stated that it was the first request in eight years for an increase in basic rates. The letter's discussion of business as a regulated activity acknowledged that "government regulation can be a major factor in Washington Energy's ability to perform," and that "[r]egulation can make or break us." The letter explained the WUTC's role in the rate increase request and stated that "[t]he commission has until October 1993 to act upon our proposal."

*April 1993 Press Release.* Defendants issued a press release and filed a Form 8–K with the SEC noting that the WUTC staff had recommended a rejection of the proposed rate increase. The press release stated that "WNG strongly disagrees with the majority of the staff's proposals and will contest them to the maximum extent possible."

*June 1993 Announcement.* Defendants announced that Washington Natural Gas had lowered its rate increase request to 4.6%, and that the revised request was expected to raise $14.8 million annually.

**B. Market's Perception of the Rate Increase Request**

The following observations by analysts exemplify the market's perception of the proposed rate increase:

*July 1992 Ragen MacKenzie Report.* A research report from Ragen MacKenzie observed that "based on future rate relief and more normal weather, we believe the common stock dividend may again be increased in late calendar 1993." This report concluded by upgrading its investment opinion on WEC.

*March 1993 Ragen MacKenzie Report.* An analyst noted that "we believe earnings

could rebound to the $1.75 per share range or higher, depending on the level of rate increase granted and the level of weather-related heating sales next winter."

*April 1993 Ragen MacKenzie Report.* Following the WUTC staff's recommended rejection of the proposed rate increase, Ragen MacKenzie issued a report stating:

> The staff proposed to disallow (among other things) $30 million of water heaters on lease that have historically been allowed in rate base.

> The staff of the WUTC has in recent years carried an extremely adversarial position in many utility rate cases. We consider this to be the "opening volley" of the rate case, whereby the staff postures for its position. The WUTC has been known to differ quite often with staff recommendations.

> Nevertheless, this negative proposal highlights the "tougher" regulatory climate arising in most states as many utilities benefit from lower interest rates but face slower economies.

> Ultimately, we believe Washington Energy will receive a rate increase in October (enough to retain the current $1.40 dividend), but will not receive the majority of its $34.4 million (13%) request in additional revenues.

*April 1993 Merrill Lynch Report.* A Merrill Lynch research report also attempted to explain the difference in the commission staff's filing versus WEC's:

> That staff has requested that $80 million be removed from WNG's rate base which would result in $14 million in lower tariff revenues. The $80 million pertains to working capital differences and leased merchandise. At the commission's request (some time ago) WNG purchased water heaters for customers to lease and allowed WNG to include this investment in the rate base and provide a tariff accordingly. It is not known at this time if the commission has changed its position on this issue.

> . . .

> While WNG has been allocating costs according to functions, activities, businesses, etc., it is not clear why the staff has recom-

mended a different approach, or which method will ultimately be approved by the Washington Commission.

. . .

We believe several of these issues deal with philosophical differences.... Although the outcome remains uncertain, we believe that even if some costs are ultimately excluded, WNG earnings outlook remains positive. It is important for investors to realize that certain businesses could ultimately be excluded from WNG's rate base.

Several other market reports emphasized that WEC's future profits and dividends depended on the proposed rate increase.

### C. WUTC Decision

On September 28, 1993, WEC announced that the WUTC had ordered Washington Natural Gas to lower its rates by 5 percent. The WUTC found that Washington Natural Gas had used utility income to subsidize its non-utility subsidiaries. The WUTC excluded numerous improper items from the rate base, including $5.5 million in costs from marketing trips and sport events and $1.1 million in advertising expenses. A supplemental order from the WUTC concerning the 1992 proposal stated that "the company's initial proposal was predicated upon a number of positions that the Commission had strongly and repeatedly rejected.... It is regrettable that so many of these items had to be relitigated in this proceeding."

### D. Alleged Omissions of Material Fact

Plaintiffs base their securities fraud claims on the theory that Defendants failed to disclose that the WUTC had denied similar requests by WEC on previous occasions because WEC had improperly allocated costs in the areas of advertising expenses, salaries, and merchandising. A 1988 WUTC Final Report stated:

It strikes the staff that WNG is subject to the same market driven diversification strategy that has caused difficult allocation problems in the telecommunications industry.... Without structural separations it puts a heavy emphasis on proper allocations.... The staff was surprised by

WNG's apparent lack of concern about improper accounting for marketing expenditures.

This 1988 WUTC decision was a matter of public record pursuant to section 80.01.090 of the Washington Code.

Additionally, Plaintiffs contend that Defendants recklessly disregarded the following trends: a major decline in long term interest rates, which caused a decline in the rates of return allowed for public utilities; growing regulatory skepticism toward regulated utilities' charges for marketing expenses; and increasing regulatory attacks on charges for activities of unregulated subsidiaries.

### E. Proceedings in the District Court

Plaintiffs brought this class action suit alleging that Defendants violated § 10(b) and § 20 of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. Plaintiffs also asserted that Defendants' conduct violated the Washington State Securities Act, the Washington Consumer Protection Act, and common law negligent misrepresentation. Upon Defendants' Rule 12(b)(6) motion to dismiss, the district court determined that Plaintiffs had abandoned some of their claims. The district court concluded that the remaining claim was that Defendants had perpetrated a fraud on the market in violation of securities law by openly stating the benefits of Washington Natural Gas's proposed rate increase without revealing material facts suggesting that the WUTC would deny all or large portions of the rate request. The district court granted Defendants' motion to dismiss, finding that all of Defendants' alleged omissions were matters of public record under state law, and that Defendants had no independent or affirmative duty to disclose that information.

## II

### STANDARD OF REVIEW

This panel reviews de novo the district court's order dismissing the case for failure to state claim. *In re Wells Fargo Sec. Litig.,* 12 F.3d 922, 925 (9th Cir.1993), *cert. de-*

*nied,* —— U.S. ——, 115 S.Ct. 295, 130 L.Ed.2d 209 (1994). All allegations of material fact are taken as true and construed in the light most favorable to Plaintiffs. *Id.* However, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim. *In re VeriFone Sec. Litig.,* 11 F.3d 865, 868 (9th Cir.1993).

# III

## DISCUSSION

Plaintiffs' appeal focuses on the claim under § 10(b) of the Securities Exchange Act of 1934. Section 10(b) makes it unlawful "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device." 15 U.S.C. § 78j(b)(1988). Rule 10b–5 issued thereunder makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

A duty to disclose analysis bears on whether Plaintiffs "adequately allege a material misrepresentation or omission." *Veri-Fone,* 11 F.3d at 869. "Silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic, Inc. v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1988). Plaintiffs assert that Defendants failed to disclose: 1) that the WUTC had previously disapproved of Defendants' wrongful allocation of costs and attempts to subsidize unregulated operations, and 2) that the 1992 rate increase request was predicated on the same condemned practices.

Other circuits have specifically addressed similar securities fraud claims against regulated public utilities. In *Sailors v. Northern States Power Co.,* 4 F.3d 610 (8th Cir.1993), the Eighth Circuit considered allegations that Northern States Power (NSP) failed to make certain public disclosures regarding its request for a rate increase. Specifically, the plaintiff alleged that the utility failed to disclose: 1) NSP's use of an unfavorable future forecasted year in its rate application; 2) the

unprecedented opposition to the rate increase filed by the state and intervenors; 3) NSP's use of an untried theory seeking higher rates as a reward for high performance; 4) the improper allocation of expenses in NSP's operation the next year; and 5) a motion to dismiss the rate case that the Minnesota Attorney General and the Minnesota Department of Public Service filed. 4 F.3d at 612. The plaintiff argued that the NSP "should have informed the public that its proposal was a gamble since NSP was relying on improper, disfavored, and untried strategies." *Id.*

The court in *Sailors* disagreed, holding that:

The 'litigation strategy' used by NSP [in pursuit of its request to the Minnesota Public Utilities Commission for a rate increase] cannot be the basis of a Rule 10b–5 action under such circumstances. . . . Plaintiff suggests that NSP should in effect publicize that it was probably not entitled to the rate increase. Assuming that the information may have been material to an investor, we find no duty of NSP to disclose any of the information. Much of what the plaintiff argues was hidden from public view is actually part of the regulatory process and upon reasonable inquiry was available to the public. . . . [O]nce a utility has informed investors that it is involved in a regulatory proceeding, it has no affirmative duty to provide investors with a further summary of the regulatory process.

*Id.* (citing *Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 515–18 (7th Cir.1989)).

In *Wielgos,* the plaintiffs asserted that a utility company failed adequately to disclose the risk that the government might reject its application for a license to run a series of nuclear plants. The court found that:

Issuers need not "disclose" Murphy's Law or the Peter Principle, even though these have substantial effects on business. So too issuers need not estimate the chance that a federal agency will change its rules or tighten up on enforcement.

892 F.2d at 515.

We agree with the reasoning and holdings of *Sailors* and *Wielgos.* The soundness of

such rulings is demonstrated by the facts of this case which are representative of normal public utility rate setting proceedings, most of which are simply new chapters in a continuing regulatory relationship between the parties. The regulatory process by which a public utility rate is fixed and the effect of that process on a utility stock's market value are materially different from the way an efficient market digests relevant information and renders decisions regarding the value of other securities. The application for a rate increase is a matter of public record. Rate making proceedings are formal, formatted, controlled by unique rules and considerations, and public. The rate making process is influenced by economic trends, such as interest rates, and by political and legislative forces.

The rate case involves a litigated administrative proceeding before an independent state commission, such as the WUTC, during which the utility presents its proposal and makes its best case for a rate increase. The state commission, which is an administrative arm of the legislature, is "free, within the limitations imposed by pertinent constitutional and statutory commands, to devise methods of regulation capable of equitably reconciling diverse and conflicting interests." *Duquesne Light Company v. Barasch*, 488 U.S. 299, 313, 109 S.Ct. 609, 618, 102 L.Ed.2d 646 (1989).[1] The state commission analyzes the relevant information and renders a decision which is dispositive of the rate.

In this unique context, the kind of information claimed to be fraudulent, such as misleading predictions about the final rate decision, awaits a different kind of arbiter than the unseen hand of the market. As such, anyone-including research analysts-attempting to predict the judgment of that intermediate arbiter engages, by definition, in a problematic exercise distinguishable from the normal investment decision. Anticipating the decision of the rate making commission is qualitatively different from anticipating the judgment of the market.

In this sense, the public utility rate making context evokes the considerations that animate the "bespeaks caution" doctrine, a doctrine that provides a mechanism by which a court can rule against a fraud on the market claim as a matter of law. Such a doctrine was

> developed to address situations in which optimistic projections are coupled with cautionary language—in particular, relevant specific facts or assumptions—affecting *the reasonableness of reliance on and the materiality* of those projections. To put it another way, the 'bespeaks caution' doctrine reflects the unremarkable proposition that statements must be analyzed *in context*.

*In re Worlds of Wonder Securities Litig.*, 35 F.3d 1407, 1414 (9th Cir.1994)(emphasis added)(quoting *Rubinstein v. Collins*, 20 F.3d 160, 167 (5th Cir.1994)). "[A]n issuer's public statements cannot be analyzed in complete isolation." *In re Convergent Technologies Sec. Litig.*, 948 F.2d 507, 512 (9th Cir.1991). As this case demonstrates, reliance on predictive statements in the context of regulatory proceedings is inherently unreasonable. Basing an investment decision on an anticipated and contingent outcome of a litigated regulatory proceeding, even *with* full knowledge of the prior history of the parties, is tantamount to sheer speculation; and guessing wrong hardly suggests fraud.

Accordingly, an investor who relies on such information cannot be said to be misled by an "untrue statement of material fact." *See* 17

---

**1.** In *Duquesne*, the Supreme Court decided the constitutionality of certain state practices related to the setting of an electric utility's rate base. There, the Supreme Court recognized the unique nature of rate making determinations:

> The economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single correct result.
>
> . . .
>
> [T]he impact of certain rates can only be evaluated in the context of the system under which they are imposed. One of the elements always relevant to setting the rate . . . is the return investors expect given the risk of the enterprise. . . . The risks a utility faces are in large part defined by the rate methodology because utilities are virtually always public monopolies dealing in an essential service, and so relatively immune to the usual market risks.

488 U.S. at 314–15, 109 S.Ct. at 619.

C.F.R. § 240.10b–5(b). The context of the regulatory process does not ordinarily invoke a duty to disclose or provide a basis for a securities fraud claim. Thus, a utility that has announced it has submitted an application for a rate increase normally has no duty to inform the public of any facts or circumstances in addition to those set forth in the application. *See Sailors*, 4 F.3d at 612; *Wielgos*, 892 F.2d at 515.

Here, WEC's alleged omissions related to the specific accounting methods on which it predicated its rate increase proposal and the past failure of similar proposals. This information was part of the regulatory process. WEC had clearly stated that the rate increase proposal was pending before the WUTC, and that any additional future revenues depended on the WUTC's approval of the rate increase. The WEC shareholders were accurately told in the letter of December 4, 1992, that government "regulation can make or break us." In fact, market analysts openly acknowledged patent uncertainty about the WUTC's rate base determination and changes in regulatory enforcement. Accordingly, it is evident that the market was alerted to the regulatory nature of the proceedings. Once the market had been so alerted, WEC did not have a duty to disclose further information about the rate making proceedings. Therefore, the alleged omissions do not provide a basis for a Rule 10b–5 claim.

Accordingly, we affirm the district court's dismissal of Plaintiffs' fraud on the market claims.

**AFFIRMED.**