In re CARTER–WALLACE, INC. SECURITIES LITIGATION.

Joan T. BRUNJES, on behalf of herself and all others similarly situated, Plaintiff–Appellant,

Eugene Honeyman, individually and on behalf of all others similarly situated, Consolidated Plaintiff–Appellant,

v.

Henry H. HOYT, Jr., Daniel J. Black, Paul A. Veteri and Carter–Wallace, Inc., Defendants–Appellees,

Joseph S. Harun, Consolidated– Defendant–Appellee.

Docket No. 97–7345.

United States Court of Appeals, Second Circuit.

Argued Oct. 20, 1997.

Decided July 13, 1998.

**154**

Weiss, Weiss & Yourman, New York City, of counsel), for Plaintiffs–Appellants.

Eric M. Nelson, Whitman, Breed, Abbott & Morgan, New York City, for Defendants–Appellees.

Before: WINTER, Chief Judge, MESKILL, Circuit Judge, and MARTIN, District Judge.*

WINTER, Chief Judge:

Joan T. Brunjes and Eugene Honeyman appeal from Judge Duffy's dismissal pursuant to Fed.R.Civ.P. 12(b)(6) of their securities-fraud action. Their complaint alleged that Carter–Wallace, Inc. violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1971), by: (i) making materially false statements in the advertisements it ran in two medical journals, *Neurology* and *Archives of Neurology,* (ii) failing to disclose information that would correct misleading representations in its financial statements, and (iii) violating Generally Accepted Accounting Principles ("GAAP"). The district court held that, as a matter of law, Carter–Wallace's advertisements in medical journals were not made "in connection with" a securities transaction and that the other omissions and statements identified in the complaint were not materially misleading. We do not agree that detailed drug advertisements in sophisticated medical journals can, as a matter of law, never be statements made "in connection with" a securities transaction. We affirm the dismissal of appellants' other claims.

## BACKGROUND

We of course accept the allegations of the complaint as true. *See Jaghory v. New York State Dept. of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In July 1993, Felbatol, a new anti-epileptic drug produced by Carter–Wallace was approved by the Food and Drug Administration ("FDA") for sale as prescription medication. In August 1993, Carter–Wallace

Robert P. Sugarman, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York City (Ralph M. Stone, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York City, Richard J. Kilsheimer, Frederic S. Fox and Joel B. Strauss, Kaplan, Kilsheimer & Fox, LLP, New York City, Jules Brody, Stull, Stull & Brody, New York City, Joseph H.

---

* The Honorable John S. Martin, Jr., of the United States District Court for the Southern District of New York, sitting by designation.

commenced selling Felbatol, hailing it as the first major anti-epileptic drug to be introduced in the United States in over fifteen years.

To promote Felbatol, Carter–Wallace ran a sixteen-page advertisement in the January 1994 issue of *Neurology*. The advertisement recited Felbatol's safety record and stated that "no life-threatening liver toxicities or blood dyscrasias have been attributed to Felbatol monotherapy." An identical advertisement appeared in the January 1994 issue of *Archives of Neurology*. Five-page advertisements containing the same statement appeared in the February, March, April, May, June, and July 1994 issues of *Neurology* and *Archives of Neurology*.

During this period, Carter–Wallace issued other statements that are the subject of appellants' complaint. Specifically, in June 1994, Carter–Wallace filed with the Securities Exchange Commission a Form 10–K in which it stated, pursuant to Section 13(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(a), that its sales were higher as a result of "greater than planned introductory sales of Felbatol." In its annual "Report to Shareholders," included in the Form 10–K, Carter–Wallace also represented that "Felbatol sales have exceeded expectations," that "[t]his rate of growth is expected to continue," and that the company expected "to receive royalties, which could be significant" from licensing Felbatol.

The present action concerns information received by Carter–Wallace in 1994 indicating that Felbatol caused, in some patients, a fatal form of acquired bone-marrow failure known as aplastic anemia. Carter–Wallace received the first report of a Felbatol-related aplastic-anemia death in January 1994. A report of another such death was received in March and reports of two deaths were received in each of April and May. On August 1, 1994, after four additional deaths were reported in July—amounting to a total of ten deaths—Carter-Wallace and the FDA issued a "Dear Doctors" letter, recommending that most patients be withdrawn from Felbatol treatment.

Appellants purchased shares of Carter–Wallace stock in June and July 1994. They allege that Carter–Wallace's advertisements in the medical journals were false and that its statements regarding Felbatol in the Form 10–K were misleading in the absence of disclosure of the reports of death due to aplastic anemia. They further allege that the advertisements and the Form 10–K misled the market and distorted the price of Carter–Wallace stock, thereby violating Section 10(b). In addition, appellants contend that Carter–Wallace violated GAAP, and, in turn, Section 10(b) by overstating the value of its Felbatol inventory when it knew the drug would not be commercially viable.

The district court dismissed the complaint under Rule 12(b)(6). With respect to appellants' claims based on the advertisements in the medical journals, the district court found that the advertisements in stating that no reports of life-threatening effects had been received were false. *See In re Carter–Wallace Sec. Litig.*, No. 94 Civ. 5704 (S.D.N.Y. Feb. 11, 1997). Nevertheless, it held that the advertisements were not actionable under Section 10(b) because, as a matter of law, drug advertisements in medical journals "[a]re not made in connection with the purchase or sale of securities, but [a]re directed at a technical audience intimately familiar with the potential adverse side effects of new drugs." *Id.* With regard to appellants' other claims, the district court held that Carter–Wallace's representations in its Form 10–K and "Report to Shareholders" did not place the company under a duty to disclose prior to August 1, 1994, the Felbatol-associated deaths, because the company "justifiably went about accumulating more evidence regarding the possible adverse side effects in order to dissect the merits of the incoming reports." *Id.*

## DISCUSSION

We review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6). *See Harsco Corp. v. Segui*, 91 F.3d 337, 341 (2d Cir.1996). To state a claim under Section 10(b), "a plaintiff must plead that 'in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representa-

tion or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury.'" *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 264 (2d Cir.1993) (quoting *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir.1985)). We turn now to the disputed issues concerning the advertisement in the medical journals and the statements in Carter–Wallace's Form 10–K.

## A. *The Advertisements in Medical Journals*

■ The crux of this issue involves whether Carter–Wallace's Felbatol advertisements may constitute statements made "in connection with" a securities transaction, as required by Section 10(b). Appellants' precise allegation is that Carter–Wallace's false advertisements in *Neurology* and *Archives of Neurology* "had an impact on the market price of Carter–Wallace common stock."

■ We have broadly construed the phrase "in connection with," holding that Congress, in using the phrase "intended only that the device employed, whatever it might be, be of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities," *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860 (2d Cir.1968) (en banc) ("*TGS*"); *see also In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953, 965 (2d Cir.1993). Moreover, when, as here, a claim is based on the fraud-on-the-market theory, a "straightforward cause and effect" test is applied, *In re Ames*, 991 F.2d at 967, under which it is sufficient that "statements which manipulate the market are connected to resultant stock trading." *Id.* at 966.

Under the "cause and effect" test, we cannot say that, as a matter of law, detailed drug advertisements using technical jargon and published in sophisticated medical journals can never constitute statements made "in connection with" a securities transaction. As the Supreme Court has noted, "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Basic Inc. v. Levinson*, 485 U.S. 224, 247 n. 24, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Technical advertisements in sophisticated medical journals detailing the attributes of a new drug could be highly relevant to analysts evaluating the stock of the company marketing the drug. *See In re Time Warner*, 9 F.3d at 265 (discussing analysts' use of information).

That the market can absorb technical medical information is neither novel nor surprising. *See Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 514–15 (7th Cir.1989) (finding generally that market absorbs complex scientific data). Technical information about the medical efficacy of new drugs, whether found in advertisements or elsewhere, has an obvious bearing on the financial future of a drug company. In an economy that produces highly sophisticated products, technical information is of enormous importance to financial analysts, whether such companies are producing drugs, as here, or nuclear power plants, as in *Wielgos*. The fact that such information is found in a specialized medical journal, as here, rather than in a statement addressed to participants in financial markets, as in *TGS*, seems to us irrelevant, so long as the journals are used by analysts studying the prospects of drug companies. In fact, an analyst might consider such an advertisement more informative than a non-technical but corresponding statement to financial market professionals.

We are aware that *Ross v. A.H. Robins Company*, [1978 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,388 (S.D.N.Y. April 6, 1978), held that false product advertisements in medical journals are not actionable under Section 10(b). However, *Ross* pre-dated *Basic Incorporated supra*, and considered only the nexus between advertisements and individual investments; it did not consider the fraud-on-the-market theory, which provides a broader framework in which to analyze the "in connection with" requirement. *See In re Ames*, 991 F.2d at 967.

We hold, therefore, that false advertisements in technical journals may be "in connection with" a securities transaction if the proof at trial establishes that the advertisements were used by market professionals in

evaluating the stock of the company. We leave it to the district court on remand to decide whether the appellants' complaint with respect to the advertisements sufficiently alleges the other elements of a Section 10(b) claim.

### B. *Carter–Wallace's Financial Statements*

Appellants also argue that the district court's dismissal of their remaining claims was improper. In particular, appellants maintain that Carter–Wallace had a duty to disclose before August 1, 1994 the Felbatol-related deaths having reported in its Form 10–K an increase in sales attributable to Felbatol, significant royalties from licensing the drug, and the expectation of increased Felbatol sales in the future.

We disagree that Carter–Wallace had a duty under Section 10(b) to disclose the Felbatol-related deaths prior to August 1, 1994. The statements in Carter–Wallace's Form 10–K and its "Report to Shareholders" did not become materially misleading until Carter–Wallace had information that Felbatol had caused a statistically significant number of aplastic-anemia deaths and therefore had reason to believe that the commercial viability of Felbatol was threatened. *Cf. San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir.1996). Drug companies need not disclose isolated reports of illnesses suffered by users of their drugs until those reports provide statistically significant evidence that the ill effects may be caused by—rather than randomly associated with—use of the drugs and are sufficiently serious and frequent to affect future earnings. In the present case, four of the ten reported deaths occurred in July—the disclosure was on August 1—and the earlier reports are not by themselves sufficient to support inferences of either actual knowledge or recklessness. *See Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir.1996) (stating that reckless conduct is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care"). We therefore affirm the district court's dismissal of the appellants' claims based on these statements.

Finally, appellants allege that Carter–Wallace's financial statements violated GAAP by overstating the value of Carter–Wallace's inventory. Specifically, appellants allege that Carter–Wallace should have discounted the value of its Felbatol inventory "given its obviously impaired value." However, one cannot state a claim for securities fraud merely by alleging a GAAP violation; the allegation must be accompanied by a statement of fraudulent intent. *See Chill,* 101 F.3d at 270. In this case, no such intent can be inferred because, for the reasons stated above, Carter–Wallace had no sound reason to doubt the commercial viability of Felbatol or the value of its inventory until the reports of Felbatol-associated deaths became statistically significant.

### CONCLUSION

In conclusion, we reverse the holding that technical drug advertisements in sophisticated medical journals cannot, as a matter of law, be "in connection with" a securities transaction. Otherwise, we affirm.